# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

KAREN F.,[1]

                           Plaintiff,

v.                                                        Case No. 5:19-cv-00007-SLG

ANDREW SAUL,
Commissioner of Social Security,

                           Defendant.

---

## DECISION AND ORDER

On or about April 30, 2015, Karen F. ("Plaintiff") filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"),[2] alleging disability beginning on March 31, 2012.[3]  Plaintiff has exhausted her administrative remedies and filed a Complaint seeking relief from this Court.[4]  Plaintiff filed her opening

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time.  Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income.  Plaintiff brought claims only under Title II.  Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs.  *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI).  .

[3] Administrative Record ("A.R.") 20.  The record is filed at Docket 13. The application in the record lists June 9, 2015 as the application date.  A.R. 317.

[4] Docket 1 (Plaintiff's Compl.).

brief requesting reversal and remand for the immediate payment of benefits on July 20, 2020.[5] The Commissioner filed a response brief.[6] Plaintiff filed her reply on November 4, 2020.[7] Oral argument was not requested and was not necessary to the Court's decision. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[8] For the reasons set forth below, Plaintiff's request for relief will be granted in part.

## I.    STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[9] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10] Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[11] In reviewing the agency's determination, a court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts

---

[5] Docket 17 (Plaintiff's Br.).

[6] Docket 24 (Defendant's Br.).

[7] Docket 28 (Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[11] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

from the administrative law judge ("ALJ")'s conclusion.[12]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[13]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which he did not rely."[14] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[15]  Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[16]

## II.    DETERMINING DISABILITY

The Social Security Act (the Act) provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[17]  In addition, Supplemental Security Income (SSI) may be

---

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[16] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (*superseded in part by statute on other grounds,* § 404.1529) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[17] 42 U.S.C. § 423(a).

available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[18]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[19]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[20]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[21]  A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[22]  If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[23]  The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational

---

[18] 42 U.S.C. § 1381a.

[19] 42 U.S.C. § 423(d)(1)(A).

[20] 42 U.S.C. § 423(d)(2)(A).

[21] 20 C.F.R. § 404.1520(a)(4).

[22] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[23] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[24]  The steps, and the ALJ's findings in this case, are as follows:

**Step 1.**  Determine whether the claimant is involved in "substantial gainful activity."[25]  *The ALJ determined that Plaintiff had not engaged in substantial activity from her alleged onset date of March 31, 2012 through her date last insured of September 30, 2016.[26]*

**Step 2.**  Determine whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience.  The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.[27]  *The ALJ determined that Plaintiff had the following severe impairments:  history of a subarachnoid hemorrhage with craniotomy and clipping of a right ophthalmic artery aneurysm with resulting mild neurocognitive disorder and history of a moderate alcohol use disorder.[28]*

**Step 3.**  Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity.  If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is

---

[24] *Tackett*, 180 F.3d at 1101.

[25] 20 C.F.R. § 404.1520(a)(4)(i).

[26] A.R. 22.

[27] 20 C.F.R. § 404.1520(a)(4)(ii).

[28] A.R. 22.

conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step.[29] *The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[30]*

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed. Once determined, the RFC is used at both step four and step five. An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including impairments that are not severe.[31] *The ALJ determined that the Plaintiff had the residual functional capacity to perform "a full range of work at all exertional levels but with the following nonexertional limitations: she was limited to performing simple, repetitive, routine tasks."[32]*

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.[33] Otherwise, the evaluation process moves to the fifth and final step. *The ALJ made no finding regarding past relevant work.[34]*

---

[29] 20 C.F.R. § 404.1520(a)(4)(iii).

[30] A.R. 23.

[31] 20 C.F.R. § 404.1520(a)(4).

[32] A.R. 24.

[33] 20 C.F.R. § 404.1520(a)(4)(iv).

[34] A.R. 28.

**Step 5.**  Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC.  If so, the claimant is not disabled.  If not, the claimant is considered disabled.[35]  *The ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed and Plaintiff was not disabled under the framework of section 204.00 in the Medical-Vocational Guidelines.  The ALJ determined that Plaintiff's nonexertional limitations "had little or no effect on the occupational base of unskilled work at all exertional levels."[36]*

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from March 31, 2012, the alleged onset date, through September 30, 2016, the date last insured.[37]

### III.    PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff was born in 1965 and was 51 years old on the date last insured.[38]  She reported working until March 31, 2012.  Plaintiff reported last working as a part time hospitality/daycare worker at a hospital in 2011 and 2012.[39]  An administrator from the hospital indicated that Plaintiff "worked on an intermittent basis at the SEARHC daycare".[40]  She last earned substantial gainful activity wages in 2009.  She worked as a

---

[35] 20 C.F.R. § 404.1520(a)(4)(v).

[36] A.R. 29.

[37] *Id.*

[38] A.R. 28, 317.

[39] A.R. 332.

[40] A.R. 373.

medical records assistant from approximately May 2008 to July 2009, a native education program office assistant and teacher from 2002 to 2007, an airport security agent from 2002 to 2004, a delivery driver for less than one month in 2007, a shuttle driver in the summers of 2004 and 2005, and a travel agent from 1999 to 2001.[41]  On or about September 25, 2015, the Social Security Administration ("SSA") initially determined that Plaintiff was not disabled under the applicable rules.[42]  On March 10, 2016, the SSA affirmed the initial decision on reconsideration.[43]  On January 5, 2018, Plaintiff appeared at a hearing before ALJ Cecilia LaCara in Anchorage, Alaska.  Plaintiff requested a continuance of the hearing to obtain representation.[44]  On August 3, 2018, Plaintiff testified, with representation, at a hearing in Anchorage, Alaska before ALJ John Michaelson.[45]  The ALJ issued an unfavorable ruling on September 18, 2018.[46]  The Appeals Council denied Plaintiff's request for review on October 28, 2019.[47]  On December 2, 2019, Plaintiff filed her Complaint; she is represented by counsel in this appeal.[48]

---

[41] A.R. 359, 390–99.

[42] A.R. 20, 75.

[43] A.R. 76.

[44] A.R. 58–59.

[45] A.R. 20, 44–51.

[46] A.R. 17–30.

[47] A.R. 1–5.

[48] Docket 1.

*Medical Records and Medical Opinion Evidence*

In this case, the Court's summary of the medical evidence focuses on the time period between March 31, 2012 and September 30, 2016.[49] However, the following are the relevant records before March 31, 2012:

On May 24, 2000, Plaintiff saw Jonathan Zarley, M.D., at Mount Edgecumbe Hospital in Sitka, Alaska, for an initial evaluation following rehabilitation for a subarachnoid hemorrhage she developed on April 1, 2000. She reported problems with short-term memory. On examination, Dr. Zarley observed no motor or sensory deficits and an unremarkable gait. Dr. Zarley noted that Plaintiff's speech was fluent and goal-oriented and Plaintiff was able to answer questions regarding remote current events, but also noted that Plaintiff was "unable to come up with the day of the week, or the day of the month"; unable to recall what day she traveled from Anchorage; and was uncertain about her living situation.[50]

On August 22, 2005, Plaintiff saw Brian Trimble, M.D., at Alaska Native Medical Center for a neurology consultation. She reported vision problems with the right eye. Dr. Trimble opined that Plaintiff had made "an excellent recovery" from her aneurysm in 2000 and "other than some complaints of difficulty with short-term memory, [Plaintiff] remains neurologically intact." He opined that Plaintiff's "aneurysm [was] cured and there [were] no acute changes going on inside the head according to a CT scan. He recommended

---

[49] This is the period from Plaintiff's alleged onset date through her date last insured. A.R. 22.

[50] A.R. 624–25.

Case 5:19-cv-00007-SLG   Document 29   Filed 01/28/21   Page 9 of 29

re-examining Plaintiff's eye to check for interval change and to follow up with neurology as needed.[51]

The following are the relevant records during the relevant time period between March 31, 2012 and September 30, 2016:

On May 11, 2012, Plaintiff saw Brian Trimble, M.D., at Mount Edgecumbe Hospital Neurology Specialty Clinic. Plaintiff reported a head contusion with a history of aneurysm. On physical examination, Dr. Trimble observed that Plaintiff's vision was grossly intact; her face was symmetrical and tongue was midline; she had normal muscle, bulk, and tone with no apparent weakness; a negative Romberg sign; and a normal gait. Dr. Trimble opined that Plaintiff was "asymptomatic" and her "risk for future aneurysms [was] unlikely." He concluded there was no need for routine imaging. He recommended that Plaintiff research websites for exercises to enhance her memory.[52]

On December 26, 2013, Plaintiff saw Donna Smith, M.D., for an annual exam. Plaintiff reported "no physical residual effects; however, she does have some problem[s] with her short-term memory."[53]

On June 24, 2015, Plaintiff met with SSA agent E. Jacquez to complete her disability form for her initial application. The agent noted that Plaintiff arrived approximately 45 minutes early to her appointment, "had difficulty remembering dates and names," took notes throughout the interview, and was friendly and cooperative.[54]

---

[51] A.R. 621–22.

[52] A.R. 514–15.

[53] A.R. 522–23.

[54] A.R. 357.

On September 15, 2015, Plaintiff saw Nathan Williams, M.D., at MDSI Physician Services in Eugene, Oregon. Plaintiff reported, "I can't remember anything. My poor memory is keeping from being able to get a job." She reported that she forgot to go to appointments, to flush the toilet, whether dishes were dirty or clean in the dishwasher, and to pick her husband up from work. She reported remembering how to drive, swim, cook, and sew. Plaintiff also reported that she had not left food on the stove or forgotten to lock the door. Plaintiff reported quitting or being fired from multiple jobs due to her poor memory. She reported showering, dressing, and cooking for herself; doing laundry; taking the trash out; dusting every two weeks; and vacuuming at least once a week. Plaintiff indicated that she drove her husband to work and picked him up each day. She reported drinking two growlers of beer each weekend with her husband. Dr. Williams observed a normal physical examination and a 26/30 on a mini mental status examination. Dr. Williams noted that Plaintiff said she was in Springfield, but was in Eugene, and that Plaintiff could not recall three objects from memory. Dr. Williams diagnosed Plaintiff with impaired memory, post brain aneurysm. He assessed Plaintiff with no physical functional limitations.[55]

On September 25, 2015, Thomas Davenport, M.D., an agency physician, reviewed Plaintiff's medical record. Based on his review of the record, Dr. Davenport concluded that Plaintiff's ability to remember locations and work-like procedures was not significantly limited and she was able to understand and remember very short and simple instructions, but not detailed instructions. He noted that Plaintiff had received a malingering diagnosis

---

[55] A.R. 478–84.

in the past and her current mini mental status exam score was 26/30, which was lower than average, but would allow her to work. Dr. Davenport discounted Plaintiff's credibility. He noted that Plaintiff's IQ point loss in one year was not reasonable for someone who functioned at her level. He observed that Plaintiff provided a list of all of the things she had forgotten and the date and time she forgot them. Dr. Davenport also pointed out that although Plaintiff reported losing her last two jobs due to memory problems, it was noted that "she quit one because she didn't get along with [co-workers] and quit the other because it was boring."[56]

Also on September 25, 2015, Ben Kessler, Psy. D., reviewed records of Plaintiff's mental impairments and found that Plaintiff had a non-severe intracranial injury and a severe impairment of organic brain syndrome. Dr. Kessler determined that Plaintiff had no restriction of activities of daily living; no difficulties maintaining social functioning; and no repeated episodes of decompensation. Dr. Kessler concluded that Plaintiff's ability to understand, remember, and carry out detailed instructions was moderately limited and that Plaintiff's ability to maintain attention and concentration for extended periods was also moderately limited. However, he opined that Plaintiff's ability to complete a normal workday and workweek was not significantly limited, so long as Plaintiff was only given very short and simple instructions and was required to perform only simple, routine tasks.[57]

---

[56] A.R. 67–68, 72–74.

[57] A.R. 68–72.

Case 5:19-cv-00007-SLG   Document 29   Filed 01/28/21   Page 12 of 29

On March 2, 2016, Plaintiff saw William McConochie, Ph.D., for a neuropsychological evaluation to help determine eligibility for benefits with a special request to clarify memory and cognitive problems. Dr. McConochie reviewed the results of an evaluation from December 9, 2010 by Jacqueline Bock. Dr. McConochie noted that testing in 2010 yielded a full-scale IQ score of 76 and that Plaintiff had verbal learning scores "similar to those of individuals with severe brain damage." Dr. McConochie also noted that Dr. Bock diagnosed Plaintiff with cognitive disorder, not otherwise specified, secondary to brain aneurysm and possible malingering. Dr. McConochie interviewed Plaintiff and Plaintiff's husband and administered several tests. Plaintiff reported memory problems in her daily life. Dr. McConochie noted that Plaintiff did not report a history of dizziness, concussions, convulsions, headaches, or temper control problems suggestive of current brain damage. She reported that she could perform her activities of daily living and do all household chores, grocery shop, and cook meals. She reported that she could drive, but recently caused an accident involving a bus and another car by driving the wrong way on a one-way street. Dr. McConochie observed that Plaintiff's full-scale IQ score of 77, which was comparable to her score of 76 on the same test in 2010. He did note that it was also inconsistent with her reported average grades in high school. He observed a processing speed index of 65 which was in the mild retardation range. Dr. McConochie noted that this score was "consistent with her history of aneurysm and related problems." He observed that Plaintiff performed in the borderline range overall in memory functioning. He also noted that Plaintiff admitted to a history of alcoholism, "which may in part account for this apparent decrease [in cognitive function]." Dr. McConochie opined that Plaintiff did not appear to be malingering or inebriated. He

diagnosed Plaintiff with mild neurocognitive disorder due to alcoholism and aneurysm and moderate alcohol use disorder. He opined that Plaintiff would have a moderate to severe impairment understanding and remembering instructions and moderate impairments in sustaining concentration, attention, and persistence and engaging in appropriate social interaction. He opined that Plaintiff's prognosis for change was poor "in the case of brain damage, as it has been 15 years since the event" and fair for alcoholism with cooperation from her husband and appropriate treatment.[58]

On March 9, 2016, Scott Kaper, Ph.D., provided an opinion supporting the SSA's initial decision to deny benefits to Plaintiff. He noted that "Dr. McConochie did not suspect malingering. He found some significant deficits in verbal free recall, and to a lesser extent in cued verbal recall." Dr. Kaper opined that Plaintiff' had understanding and memory limitations. However, Plaintiff's "visual memory was a relative strength, especially when she had cues to work with. This evidence supports the efficacy of the countermeasures she uses, e.g., making lists." He also opined that Plaintiff's verbal working memory was "a relative strength, as it fell into the Low Average range on the WAIS–IV." Dr. Kaper determined that Plaintiff had no restrictions of daily living; no difficulties in maintaining social functioning; and no episodes of decompensation. He also determined that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace, but was capable of completing a normal workday and workweek without interruption so long as limited to simple, routine tasks.[59]

---

[58] A.R. 555–61.

[59] A.R. 85–89.

Case No. 5:19-cv-00007-SLG
Decision and Order
Page 14 of 29

On or about March 9, 2016, Sharon Eder, M.D., an agency physician, reviewed Plaintiff's records and affirmed Plaintiff's initial determination that Plaintiff was not disabled and was capable of heavy work. Dr. Eder reviewed Dr. McConochie's report and determined that Plaintiff would "likely still be capable of simple tasks."[60]

The following are relevant records after September 30, 2016:

On June 20, 2018, Plaintiff saw Mary McClelland, M.D., at Kaiser Permanente in Clackamas, Oregon. She requested a mental screening for short term memory problems. Dr. McClelland recommended a full neurological evaluation and opined that Plaintiff had "significant deficits noted on exam[ination] and mini cogn[itive examination]."[61]

On July 3, 2018, Plaintiff saw Mahadeva Branaven, M.D., at Kaiser Permanente, for a neurological consultation. Dr. Branaven observed no suggestion of dementia and stated, "her symptoms have not progressed though she has not returned to her prior baseline post injury." On examination, Dr. Branaven observed mild word-finding difficulty, but intact speech with no dysarthria; normal facial symmetry; intact facial sensation; midline tongue and palate; a negative Romberg sign; 2+ reflexed throughout; intact light touch; and normal motor bulk and tone; difficulty with executive tasks, registration, and recall; and poor verbal fluency and performance of calculations. Dr. Branaven also noted that "[b]ased on the Montreal cognitive Assessment today she clearly has baseline deficits and I encouraged her to continue to work on mental stimulation, reading and talking about

_____

[60] A.R. 84–85, 89–91. The signature for Dr. Eder is dated December 30, 2015, but her evidence review and determination include Dr. McConochie's March 2, 2016 evaluation. A.R. 84.

[61] A.R. 598–602.

what she read as well as work on crosswords and social interactions and try to work on exercise." Dr. Branaven advised that Plaintiff no longer drive.[62]

On July 6, 2018, Plaintiff had a CT scan of the brain and head. The CT showed "status post right orbitofrontal craniotomy with placement of an aneurysm clip in the right suprasellar cistern; right parietal approach ventricular shunt catheter with tip in the region of the right frontal horn; mild encephalomalacia of the anterior inferior right temporal lobe, most likely postoperative in nature given its location; bandlike left frontal lucency compatible with gliosis along an old shunt tract; small calcification in the right frontal lobe that may be related to prior hemorrhage or infection; and subtle lucency in the right thalamus that may be related to old ischemic change or injury.[63]

*Function Reports*

On July 2, 2015, Plaintiff completed a function report. She reported living in an apartment with her husband. She stated, "I have lost my last 2 jobs because of my memory problems. I'm constantly forgetting things. I cannot hold a job because of my memory. I quit TSA because of my memory problems. That was a federal job with good pay [and] benefits. I really didn't [want] to quit that one because of [the] pay [and] benefits." She indicated that she did household chores, grocery shopped, and did errands during the day. Plaintiff reported forgetting her goggles after swimming and that she needed cell phone reminders for daily functioning. She reported that she walked, drove a car, rode in a car, and used public transportation for travel. Plaintiff indicated that her

---

[62] A.R. 605–09.

[63] A.R. 611–12.

Case No. 5:19-cv-00007-SLG
Decision and Order
Page 16 of 29

poor short-term memory affected completing tasks, concentration, understanding, and following instructions. She also indicated that she had never been fired or laid off from a job because of problems getting along with other people. She remarked, "my memory has been permanently damaged by my brain injury."[64]

On July 5, 2015 and January 10, 2016, Plaintiff's husband, Michael F., completed function reports. He reported that he and Plaintiff went swimming and walking, went to the dog park and music events, traveled, and watched movies together. Michael F. stated that his wife suffered from "short-term memory dysfunction which limit[ed] her ability to retain detailed information such as work instructions, directions, requests, etc." He indicated that Plaintiff had been "let go" from jobs due to her inability to remember written and verbal instructions and that Plaintiff resigned from her position as a TSA screening agent "because she couldn't remember what she had just seen on the x-ray screen." He opined that Plaintiff's condition was "directly related to her brain aneurysm and surgery." Michael F. reported that Plaintiff did laundry, household chores, ran errands, made meals, and picked him up from work. He also stated that he did "a lot of the cooking." He indicated that Plaintiff was able to take care of her personal care, but she forgot to flush the toilet. He indicated that he needed to "help [his] wife by constantly reminding her of what needs to be done, and making sure that she puts reminders in her cell-phone to help her." Michael F. reported that Plaintiff watched television "quite a bit because her attention span [was] lacking for reading books or studying" and that he believed "her general motivation for reaching goals and accomplishing tasks has diminished since her

---

[64] A.R. 374–81.

illness." He reported that Plaintiff's condition affected her memory, completing tasks, concentration, understanding, and following instructions. He noted that he was very concerned about Plaintiff driving alone and that she had recently been given a citation for driving the wrong way on a one-way street, causing an accident. Michael F. indicated he was "increasingly concerned that [Plaintiff's] memory loss may be progressing." He stated that Plaintiff was "incapable of fast-paced activity or quick decision and multi-tasking."[65]

On December 27, 2017, Michael F. wrote a letter to ALJ LaCara regarding Plaintiff's memory difficulties.[66] Plaintiff also wrote a letter to ALJ LaCara. She reported that she spent her day "running back and forth in between rooms trying to figure out what [she] was doing" and that she was "[c]onstantly writing things down."[67]

On March 26, 2018, Plaintiff's mother, Sarah W., wrote a letter on Plaintiff's behalf. She reported that Plaintiff had not "been the same" since surviving a cerebral hemorrhage in 2000 and that Plaintiff's memory had "gotten worse and worse over the years." Sarah W. indicated that "[w]hile her long-term memory remains as well as ever, her short-term memory is close to nothing."[68]

On April 2, 2018, the SSA office in Anchorage received a letter from Alicia W., Plaintiff's sister. Alicia W. described Plaintiff's cerebral hemorrhage on April 1, 2000 and noted that her sister had "not been the same since the incident" and that it was hard for

---

[65] A.R. 382–89, 415–422.

[66] A.R. 444–45.

[67] A.R. 446–47.

[68] A.R. 458.

her sister "just to remember basic things like the date and time everyday." She indicated that Plaintiff's "perception, understanding of people and things around her, and communication with others [was] not the same as it was before."[69]

*Hearing Testimony on August 3, 2018*

Plaintiff testified, with representation, at a hearing in Anchorage, Alaska, before ALJ Michaelsen. She testified that her short-term memory was "bad" and she was still affected by the aneurysm that took place in 2000. She testified that in March of 2012 she drove the wrong way on a one-way street and almost caused an accident. She reported that she was fired from her last job in 2012 because she "wasn't learning fast enough for them." Plaintiff testified that she quit her job as a TSA security officer because she could not remember what she was looking at in the x-ray. She reported that she had worked as a cultural native instructor and van driver, but she stopped working those jobs because "they'd only last through the school year." She testified that she was fired from a preschool job and "they basically told me don't come back to work." Plaintiff also testified she was fired from her hospitality job at a hospital, stating "I wasn't doing it properly or by their rules so they basically fired me." She described her memory problems, reporting that she would go in and out of a room at least 10 times a day because she couldn't remember why she walked into the room and that her husband wouldn't let her drive. Plaintiff testified that she would not be able to live independently and that her husband had to "remind me all the time what I was going to do."[70]

---

[69] A.R. 456.

[70] A.R. 44–51.

**DISCUSSION**

Plaintiff seeks remand and reversal of the Commissioner's determination and the immediate payment of benefits. Plaintiff argues that the ALJ: (1) failed to accurately consider Dr. McConochie's report regarding Plaintiff's mental impairments; (2) failed to develop an accurate RFC; (3) failed to call a vocational expert to address how a moderate impairment in maintaining attention, concentration, and persistence would affect employability; (4) failed to provide specific, clear, and convincing reasons for discounting Plaintiff's symptom testimony; and (5) failed to provide germane reasons for rejecting the lay testimony of Plaintiff's mother, sister, husband, and E. Jacquez, a Social Security Field Office Representative.[71] The Commissioner disputes Plaintiff's assertions.[72] The Court addresses the arguments herein:

A.    Dr. McConochie's Medical Opinions

Dr. McConochie examined Plaintiff in March 2016. He opined that Plaintiff had a moderate to severe impairment understanding and remembering instructions; a moderate impairment sustaining concentration, attention, and persistence; and a moderate impairment engaging in appropriate social interaction.[73] The ALJ agreed with Dr. McConochie that a moderate impairment in concentration was generally consistent with the medical records and State agency opinions.[74] The ALJ also gave reviewing agency

---

[71] Docket 17 at 11–19.

[72] Docket 24 at 6–16.

[73] A.R. 555–61.

[74] A.R. 27.

Case No. 5:19-cv-00007-SLG
Decision and Order
Page 20 of 29

consultants Drs. Kessler's and Kaper's opinions "[s]ignificant weight."[75]  The consultants concluded that Plaintiff's ability to maintain attention and concentration for extended periods was moderately limited and Plaintiff's ability to understand and remember detailed instructions was also moderately limited.[76]  Therefore, the ALJ adopted the opinion of Dr. McConochie and the agency consultants that Plaintiff's ability to sustain concentration, persistence, or pace was moderately limited.[77]

However, the ALJ rejected Dr. McConochie's opinion that Plaintiff was moderately to severely limited in the area of understanding, remembering, or applying information. Instead, the ALJ determined that "[i]n understanding, remembering, or applying information, the [Plaintiff] had no limitation."[78] The ALJ reached this determination despite Plaintiff's reports of significant memory issues and the agency's physicians' opinions that Plaintiff's ability to understand and remember was moderately limited.[79]  The ALJ also rejected Dr. McConochie's opinion that Plaintiff's mental impairments would restrict Plaintiff's ability to work.[80]

---

[75] *Id.*

[76] A.R. 71–72, 86–87.

[77] A.R. 27.

[78] A.R. 23.

[79] A.R. 23, 27, 68–72, 85–89, 555–61.

[80] A.R. 27.  Dr. McConochie defined "moderate impairment" regarding work behavior as "[p]sychologically-based problems that are likely to cause an employer to warn the employee that if behavior does not improve, dismissal is imminent" and "severe impairment" as "[p]sychologically-based problems that are likely to cause an employer to dismiss the worker." A.R. 91.

Case No. 5:19-cv-00007-SLG
Decision and Order
Page 21 of 29

An ALJ "must consider all medical opinion evidence."[81]   In the Ninth Circuit, "[t]o reject the uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence."[82]   And "if a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence."[83] An ALJ can meet this burden by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his opinion thereof, and making findings."[84]   An ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."[85]   However, "the opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician."[86]

The reviewing agency physicians concurred with Dr. McConochie's opinion that Plaintiff suffered a moderate impairment in understanding and remembering detailed instructions.  However, the agency physicians each opined that Plaintiff would still be able

---

[81] *Tommasetti v. Astrue,* 533 F. 3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)).

[82] *Trevizo v. Berryhill,* 871 F.3d 664, 675 (9th Cir. 2017) (quoting *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005)).

[83] *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017).

[84] *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted).

[85] *Ford v. Saul,* 950 F.3d 1141, 1154 (9th Cir. 2020) (quoting *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002)).

[86] *Revels,* 874 F.3d at *655* (citing *Lester v. Chater,* 81 F.3d 821, 831 (9th Cir. 1995)(emphasis in original).

to complete short and simple instructions and perform simple repetitive tasks.[87]  The ALJ was therefore required to provide specific and legitimate reasons supported by substantial evidence when rejecting Dr. McConochie's opinion as to the severity of Plaintiff's memory impairment.[88]  The ALJ provided the following reasons: (1) Dr. McConochie's opinion of a moderate to severe impairment in the area of understanding and remembering was apparently based on Plaintiff's "'brain damage,' yet the medical records did not support that diagnosis"; (2) Dr. McConochie's opinion was inconsistent with a "mild neurocognitive disorder"; and (3) Plaintiff performed skilled and semi-skilled work from 2005 to 2009.[89]

Dr. McConochie's examination of Plaintiff showed borderline intellectual functioning and a processing speed index in the "mild retardation range."  He concluded these results were "consistent with [Plaintiff's] history of aneurysm and related problems."  Dr. McConochie's mental examination also showed memory functioning in the borderline range.  He opined that some of Plaintiff's lower scaled scores may be "symptomatic of her brain damage secondary to aneurysm."[90]  Based on his examination, review of Plaintiff's records, and an interview of Plaintiff and her husband, Dr. McConochie opined that Plaintiff's moderate to severe impairments were psychologically-based problems that were likely to cause an employer to warn of dismissal or to dismiss the employee.[91]

---

[87] Drs. Kessler and Kaper opined that Plaintiff was capable of carrying out short/simple instructions, but not detailed ones.  Both physicians also opined that Plaintiff was capable of maintaining attention and concentration on short, repetitive tasks.  A.R. 71, 88.

[88] *Lester,* 81 F.3d at 830.

[89] A.R. 27.

[90] A.R. 560.

[91] A.R. 555-61

Dr. McConochie's mental limitation opinions regarding memory and understanding are supported in the medical record. The Court's review of the records reveals that from as far back as May 2000, immediately after the aneurysm, Plaintiff's treating and examining medical providers repeatedly noted that Plaintiff suffered from short-term memory problems.[92] Both of the agency doctors opined that Plaintiff was impaired by a severe organic brain syndrome. In sum, rejecting Dr. McConochie's opinion regarding Plaintiff's memory limitations because he described it as brain damage is not a legitimate reason, when it is clear that Plaintiff's short term memory function was damaged after the aneurysm.

Second, the characterization of Plaintiff's neurocognitive disorder as "mild" does not indicate "mild" symptoms. The American Psychiatric Association's Diagnostic and Statistical Manual of the American Psychiatric Association (Fifth edition) ("DSM-5") distinguishes between two neurocognitive disorders: "mild" and "major," the latter replacing the use of "dementia."[93] Mild neurocognitive disorder is used to "emphasize loss of previously acquired cognitive functions," including complex attention, learning and memory, executive ability, language, visual-constructional-perceptual ability, and social cognition.[94] Labeling a diagnosis as "mild" does not preclude a severe or even a

---

[92] See, e.g., A.R. 54, 375, 514–15, 621–22, 624–25.

[93] Mark Moran, Mild Neurocognitive Disorder Added to DSM (2013) ("Mild neurocognitive disorder ... recognizes the many patients seen by clinicians who do not meet [the] criteria for dementia but who are nevertheless clinically impaired."). The article is available at <https://psychnews.psychiatryonline.org/doi/full/10.1176/appi.pn.2013.5a18> (last visited January 21, 2021).

[94] Mary Ganguli, M.D., et al., Classification of Neurocognitive Disorders in DSM-5: A Work in Progress (2011). The article is available at <https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3076370/pdf/nihms-273128.pdf> (last visited

Case 5:19-cv-00007-SLG   Document 29   Filed 01/28/21   Page 24 of 29

listing level impairment.[95]   Further, the ALJ's lay opinion of Plaintiff's medical condition cannot provide the medical evidence needed to support the ALJ's RFC determination.[96]

Third, Dr. McConochie's opinion was rendered in 2016 and took into account Plaintiff's past work history as part of his examination.[97]   Although the ALJ discounted Dr. McConochie's opinion because Plaintiff worked after her aneurysm at the substantial gainful activity level from 2005 to 2009, the work activity noted by the ALJ pre-dates the relevant time period.[98]   Additionally, the ALJ did not take into account Plaintiff's inability to sustain employment.[99]   For example, Plaintiff reported having to resign after five months as a TSA agent because she couldn't remember the item she had just seen on an x-ray, reported being fired after two months at her job as a hospitality clerk, and reported only being able to retain seasonal work as a Native Alaskan cultural instructor.[100]   Plaintiff's earlier work activity is not a specific and legitimate reason supported by

---

January 21, 2021).

[95] *See, e.g., Gomez v. Astrue*, 695 F. Supp. 2d 1049, 1053 (C.D. Cal. 2010) (finding that "mild" mental retardation meets Listing 12.05).

[96] *See Tackett,* 180 F.3d at 1102-03 (there was no medical evidence to support the ALJ's determination); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is forbidden from making his or her own medical assessment beyond that demonstrated by the record); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings").

[97] A.R. 20, 317, 555–61.

[98] Plaintiff alleges an onset date of March 31, 2012.  A.R. 20, 317.

[99] "Occasional symptom-free periods – and even the sporadic ability to work – are not inconsistent with disability."  *Lester,* 81 F.3d at 833.

[100] A.R. 46–50, 382, 479, 507, 606.

substantial evidence to warrant rejecting Dr. McConochie's medical opinion regarding Plaintiff's memory limitations.

In sum, the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for rejecting Dr. McConochie's medical opinion and concluding that Plaintiff had no memory limitations. On remand, the ALJ shall reevaluate the weight to be afforded to Dr. McConochie's opinions.

B.   The RFC

A court should affirm an ALJ's determination of a claimant's RFC "if the ALJ applied the proper legal standard and his decision is supported by substantial evidence."[101] In assessing an RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"[102] And yet, courts have found that "[c]onsideration of 'the limiting effects of all impairments' does not necessarily require the inclusion of every impairment into the final RFC if the record indicates the non-severe impairment does not cause a significant limitation in the plaintiff's ability to work."[103] However, "an RFC that fails to take into account a claimant's limitations is defective."[104]

---

[101] *Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005) (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)).

[102] *See* SSR 96-08p, *available at* 1996 WL 374184 at *5; 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe.'").

[103] *See Medlock v. Colvin,* No. 15-cv-9609-KK, 2016 WL 6137399, at *5 (C.D. Cal. Oct. 20, 2016) (emphases omitted); *Sisco v. Colvin,* No. 13-cv-01817-LHK, 2014 WL 2859187, at *8 (N.D. Cal. June 20, 2014); *Burch v. Barnhart,* 400 F.3d 676, 684 (9th Cir. 2005) (finding ALJ's decision not to include plaintiff's obesity impairment in the RFC determination was proper).

[104] *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).

The RFC is incomplete in this case because, at a minimum, it did not adequately address Dr. McConochie's medical opinion regarding Plaintiff's memory limitations. Accordingly, the ALJ erred in formulating the RFC. Further, this error was not harmless because the ALJ relied on his assessment of Plaintiff's RFC to conclude that vocational expert testimony was not required.[105]

C.      The ALJ's Reliance on the Grids

The ALJ did not call a vocational expert to testify at Plaintiff's hearing.[106]  Instead, the ALJ used the Medical-Vocational Guidelines, 20 C.F.R. Part 4040, Subpart 4, Appendix 2 (the "Grids") to determine that Plaintiff was capable of work at all exertional levels with a non-exertional limitation of "simple, repetitive, routine tasks."[107]  A vocational expert is required when there are significant and "sufficiently severe" non-exertional limitations not accounted for by the Grids.[108] The Grids should not be used if they fail to "accurately and completely describe the claimant's abilities and limitations."[109]  In this case, as discussed above, the ALJ's RFC failed to accurately reflect Dr. McConochie's opinion regarding Plaintiff's mental limitations.  Accordingly, Plaintiff had non-exertional limitations that may not have been adequately accounted for in the Grids, and the ALJ on remand the ALJ should consider whether to obtain the testimony of a vocational expert.

---

[105] A.R. 29.

[106] A.R. 38–52.

[107] *Stout v. Comm'r of Soc. Sec.,* 454 F.3d 1050, 1055 (9th Cir. 2006) (an ALJ's error is harmless when it is "irrelevant to the ALJ's ultimate disability conclusion").

[108] *Hoopai v. Astrue,* 499 F.3d 1071, 1075–76 (9th Cir. 2007) (citing *Burkhart v. Bowen,* 856 F.2d 1335, 1340 (9th Cir. 1988)).

[109] *Jones v. Heckler,* 760 F.2d 993, 998 (9th Cir. 1985).

D.    Other Issues

Plaintiff also argues that the ALJ made additional errors, including failing to provide germane reasons for rejecting lay testimony.  She asserts that these errors constitute bases for remanding for the immediate payment of benefits.[110]  Without reaching the merits of these arguments, the Court concludes that there are sufficient unanswered questions regarding the RFC and the ALJ's step five analysis to require remand for further proceedings in this case.

E.    Scope of Remand

Here, the ALJ erred by assessing an RFC that did not adequately account for Plaintiff's mental limitations .  As a result, there are outstanding issues that need to be resolved before a disability determination can be made.[111]  Therefore, the Court reverses and remands this matter to the ALJ for the formulation of an accurate RFC that reflects all of Plaintiff's limitations.  On remand, the ALJ must conduct further proceedings, including obtaining evidence from a vocational expert at step five of the sequential evaluation process.

## V.   ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations were not free from legal error.  Accordingly, IT IS ORDERED that Plaintiff's request for relief at Docket 17 is GRANTED IN PART as set forth herein, the

---

[110] Docket 17 at 11–19.

[111] *Harman v. Apfel,* 211 F.3d 1172, 1180–81 (9th Cir. 2000).

Case No. 5:19-cv-00007-SLG
Decision and Order
Page 28 of 29

Commissioner's final decision is VACATED, and the case is REMANDED for further proceedings consistent with this Order.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 28th day of January, 2021 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE